**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**OSAIC WEALTH, INC.,**

**Plaintiff,**

**v.**

**OLGA CHERNY,**

**Defendant.**

**Civil Action No.: 25-17106 (ES) (SDA)**

**OPINION**

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant Olga Cherny's ("Defendant") motion to compel arbitration. (*See* D.E. No. 10 ("Motion" or "Mot.")); (*see also* D.E. No. 10-1 ("Mov. Br.")). Having carefully considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's Motion to Compel Arbitration is **GRANTED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

This matter arises from Defendant's investment relationship with non-party Marat Likhtenstein ("Likhtenstein"). (D.E. No. 1 ("Complaint" or "Compl.") ¶ 13). Likhtenstein "was formerly a registered representative with Royal Alliance [Associates, Inc.], a registered broker-dealer, which became part of Osaic Wealth, Inc. [("Osaic")] in June 2023." (*Id.* ¶ 14). Likhtenstein "was associated with Osaic from 2018 through 2024." (*Id.*). On June 7, 2024, Osaic terminated Likhtenstein for "failure to disclose personal loan transactions between him and a client[,]" (*id.* ¶ 15), and in August 2024, the Financial Industry Regulatory Authority ("FINRA") barred Likhtenstein "from the securities industry for his refusal to cooperate with a FINRA

investigation[,]" (*id.* ¶ 16). Furthermore, Osaic alleges that, on March 12, 2025, the Kings County District Attorney indicted Likhtenstein on 22 counts "relating to a $1.24 million Ponzi-like scheme[,]" (*id.*), and the Securities and Exchange Commission filed a civil action against Likhtenstein alleging that he "sold more than $4.1 million in fraudulent promissory notes[,]" (*id.* ¶ 17).

Osaic is a member of FINRA. (*Id.* ¶ 5). On August 8, 2025, Defendant initiated a FINRA Arbitration against Osaic. (*Id.* ¶ 12). In the associated Statement of Claim, (D.E. No. 1-1 ("SOC")), that Defendant filed with FINRA, she alleged that Likhtenstein informed her that he was a "licensed financial advisor and investment advisor with [Osaic]," which led to Defendant and Likhtenstein taking approximately ten meetings in his home office that "was full of certificates and awards of his accomplishments, including an [Osaic] sign." (SOC ¶ 3). Defendant further alleged that, through Likhtenstein "engender[ing] [Defendant's] trust and confidence in [his] ability and willingness to do anything in [his] power to properly advance all of [Defendant's] investment objectives and needs[,]" (*id.* ¶ 6), Osaic "obtained $296,500 from [Defendant] for investment purposes[,]" (*id.* ¶ 5). Based on Osaic's allegations in the Complaint, it appears that the investments in question were a form of loan governed by one or more promissory notes and secured by Likhtenstein's personal residence. (Compl. ¶ 27). In her SOC, Defendant alleged that she made those investments on December 12, 2022 (in the amount of $150,000) and March 16, 2023 (in the amount of $146,500), (SOC ¶ 14), and that the investments were "securities as defined in Section 2(1) of the Securities Act . . . and Section 3(a)(10) of the Securities Exchange Act[,]"

(*id.* ¶ 61). Defendant argues that "Likhtenstein misappropriated these funds" and "failed to disclose material information to [her]." (*Id.* ¶¶ 5 & 16).

Based on those contentions, Defendant asserts claims against Osaic in the FINRA arbitration for "(1) violations of Federal Securities laws, (2) violations of the New Jersey Uniform Securities Law, (3) violation of New York Consumer Protection Act, (4) breach of contract, (5) common law fraud, (6) breach of fiduciary duty, and (7) negligence and gross negligence." (Compl. ¶ 25). Defendant alleges that Osaic is liable "under theories of respondeat superior and agency principles." (*Id.*).

Osaic commenced this action on October 31, 2025, by filing a Complaint seeking both declaratory and injunctive relief. (*See generally* Compl.). Specifically, Osaic contends that the issues set forth in Defendant's SOC are not arbitrable before FINRA and requests both (i) a declaration to that effect; and (ii) injunctive relief prohibiting Defendant from proceeding with the FINRA arbitration. (Compl. ¶¶ 37–51).[1]

Defendant filed a motion to compel arbitration on November 21, 2025, (*see generally* Mov. Br.), and the parties submitted a Joint Status Letter highlighting the parties' respective positions on whether expedited discovery was necessary in this matter, (*see generally* D.E. No. 13). After reviewing the parties' submissions, and giving the matter careful consideration, the Court finds that it can resolve Defendant's application without further development of the factual record.

[1] Along with its Complaint, Osaic filed a motion for a preliminary injunction. (D.E. No. 3). By Order dated November 4, 2025, the Court directed Osaic to serve its Summons, Complaint, and motion on Defendant. (D.E. No. 6 at 3). The Court further directed the parties to meet and confer regarding a proposed briefing schedule for that motion. Given later events, including Defendant filing the motion to compel currently before the Court, Osaic's motion for preliminary injunction relief was never fully briefed. By Order dated June 28, 2026, noting that "further briefing may be unnecessary depending on the Court's resolution of Defendant's . . . motion to compel arbitration [,]" the Court administratively terminated Osaic's preliminary injunction application "pending resolution of the motion to compel arbitration." (D.E. No. 17).

Osaic filed an opposition brief on December 11, 2025, (*see* D.E. No. 14 ("Opp. Br.")), and Defendant filed a reply on December 16, 2025, (*see* D.E. No. 15 ("Reply Br.")).

The motion is now ripe for disposition.

## II. LEGAL STANDARD

"Before compelling a party to arbitrate pursuant to the [Federal Arbitration Act (the "FAA")], a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009). A court is required to order that the parties proceed with arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue[.]" 9 U.S.C. § 4. By contrast, "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that [it] do so." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). "When the very existence of . . . an [arbitration] agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 n.5 (3d Cir. 2013) (alteration in original) (quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 112 (3d Cir. 2000)). Nevertheless, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

## III. DISCUSSION

Defendant argues that this Court must compel arbitration because (i) Osaic is required to comply with FINRA Rule 12200 as a FINRA member; (ii) the dispute meets each of FINRA Rule 12200's requirements for arbitrability; and (iii) the Court must resolve all doubts in favor of compelling arbitration under the FAA. (*See generally* Mov. Br.). Osaic does not dispute that it is

subject to FINRA Rules, including Rule 12200. (Opp. Br. at 9). Instead, Osaic argues that it is not required to arbitrate under Rule 12200 because (i) Defendant's dispute fails to meet all of the Rule's requirements; and (ii) the presumption in favor of arbitrability under the FAA does not apply to this dispute. (*See generally* Opp. Br.). The Court addresses each argument in turn. First, however, the court must determine the appropriate standard to apply when conducting its analysis.

**A. Applicable Standard of Review**

When deciding a motion to compel arbitration, the Court must first decide whether to resolve the dispute under the "motion to dismiss" standard established in Federal Rule of Civil Procedure 12(b)(6) or, alternatively, Rule 56's "summary judgment" standard. *See Guidotti*, 716 F.3d at 771–76. "[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Id.* (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). Further, even where an agreement to arbitrate is neither explicitly mentioned on the face of the complaint nor attached to it as an exhibit, a court may properly consider the agreement under Rule 12(b)(6) if it is integral to or relied upon in the complaint or has been incorporated by reference into the complaint based on a plaintiff's allegations. *See, e.g.*, *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014); *George v. Midland Funding, LLC*, No. 18-15830, 2019 WL 2591163, at *3 (D.N.J. June 25, 2019); *Stacy v. Tata Consultancy Servs., Ltd.*, No. 18-13243, 2019 WL 1233081, at *5 (D.N.J. Mar. 14, 2019). For example, some courts in this Circuit have found an arbitration agreement to be incorporated by reference in a complaint where the underlying claims are based on agreements that contain the disputed arbitration provisions or where the complaint references an agreement

that contains the arbitration provision. *See, e.g.*, *CardioNet, Inc.*, 751 F.3d at 168 n.2; *George*, 2019 WL 2591163, at *3.

The United States Court of Appeals for the Third Circuit has clarified, however, that it is inappropriate to consider a motion to compel arbitration under a Rule 12(b)(6) standard in two instances: (i) "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate," or (ii) "if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue[.]" *Guidotti*, 716 F.3d at 776. Under either scenario, "the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement." *Id.* at 774 (internal quotation and citation omitted). "After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." *Id.* at 776; *see also Discovery House v. Advanced Data Sys. RCM, Inc.*, No. 19-21602, 2020 WL 6938353, at *4 (D.N.J. Nov. 25, 2020). Moreover, "[a] disagreement as to arbitrability is not sufficient in itself to warrant application of the summary judgment standard, because a motion to compel arbitration is necessarily predicated by the parties' disagreement to arbitrability." *Lawson v. City of Phila.*, No. 18-1912, 2019 WL 934976, at *2 (E.D. Pa. Feb. 25, 2019) (citing *Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017)). In *Silfee*, the Third Circuit clarified that, even if the parties dispute the enforceability of the arbitration agreement at issue, the Rule 12(b)(6) standard nevertheless applies where the plaintiff argues that the arbitration agreement is unenforceable for "pure legal" reasons. *See Silfee*, 696 F. App'x at 578–79 (citing *Guidotti*, 716 F.3d at 776); *see also Lawson*, 2019 WL 934976, at *2 ("In *Silfee*, there was a concededly authentic arbitration provision, and plaintiff argued that the arbitration agreement was unenforceable for 'pure legal' reasons. He did not produce additional facts to place the agreement

to arbitrate at issue and did not seek additional discovery to do so. The case was remanded to the district court for application of Rule 12(b)(6), as opposed to the summary judgment standard that had been applied by the district court.").

Here, Defendant seeks to compel Osaic to participate in FINRA arbitration pursuant to FINRA Rule 12200. The Third Circuit has recognized that, "even in the absence of a written arbitration agreement, [FINRA] Rule 12200 constitutes a binding arbitration agreement between a FINRA member and a customer." *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 93–94 (3d Cir. 2018) (citing *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2018)). Indeed, the parties appear to agree that, to the extent any arbitration agreement exists between them, it comes from Rule 12200. *Id.* at 94; (*see also* Mov. Br. at 14-15 ("Osaic does not dispute that, as a FINRA member, it agreed to comply with FINRA Rule 12200 and must arbitrate disputes with customers."); Opp. Br. at 9 ("While Osaic acknowledges it is governed by the FINRA Rules, including Rule 12200[. . .]"); Compl. ¶ 30 ("[W]hether Osaic is required to arbitrate disputes before FINRA is governed by the Code and specifically Rule 12200.")). Osaic argues, however, that because Rule 12200 arbitration is inapplicable to the disputes set forth in the Defendant's SOC, the parties have not agreed to arbitrate those claims. (*See generally* Opp. Br.). Having carefully reviewed the parties' submissions and finding that they have not identified any disputed facts relevant to that determination, the Court finds that Osaic raises "pure legal" objections to the applicability of FINRA Rule 12200, and that it can therefore resolve this issue based solely on Osaic's Complaint and the materials attached thereto or otherwise incorporated therein, without the delay inherent in permitting even limited discovery. *Silfee*, 696 F. App'x at 578–79; *see also Scarcelle v. Cardo Windows, Inc.*, No. 23-2051, 2024 WL 150330, at *3 (E.D. Pa. Jan. 11, 2024) ("Kinger Construction has not shown that the Complaint and supporting

documents are unclear regarding the agreement to arbitrate, nor has Kinger responded with additional facts sufficient to place the relevant contractual provisions in issue arguing instead that the 2011 Subcontractor Agreement is not enforceable as a matter of law."). The Court accordingly decides Defendant's Motion pursuant to Rule 12(b)(6).[2]

**B. The Dispute is Arbitrable Under FINRA**

For a dispute to be arbitrable under FINRA Rule 12200, it "must meet three requirements: (1) FINRA arbitration is required by a written agreement or requested by the customer; (2) the dispute is between a customer and a member or associated person of a member; and (3) the dispute arises in connection with the business activities of the member or the associated person." *Next Fin. Grp., Inc. v. GMS Mine Repair and Maint., Inc.*, No. 19-168, 2020 WL 924209, at *4 (W.D. Pa. Feb. 26, 2020) (citing FINRA Rule 12200). Here, neither side contends that the parties entered into a separate written agreement to arbitrate their disputes. The arbitrability of Defendant's claims will therefore turn on: (i) whether Likhtenstein is an "associated person" of Osaic, a FINRA

---

[2] In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Osaic attaches Defendant's SOC for the FINRA Arbitration to its Complaint but specifies that it does so "[w]ithout admitting or incorporating any of the allegations made by [Defendant]." (Compl. ¶ 12). However, the Court may consider the allegations in the complaint, as well as the exhibits attached to it and specifically relied upon therein. *See Sentinel Tr. Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] 'document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'" (alteration in original) (internal quotation marks omitted) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). Despite Osaic's attempts to attach the SOC to its pleading without "incorporating" it therein, the Court notes that Osaic's claims are based on Defendant filing the SOC and arbitration demand with FINRA. Absent those materials, there is nothing for this Court to enjoin. The Court may therefore consider those materials without converting Defendant's motion into an application for summary judgment.

member; (ii) whether Defendant is a "customer" for the purposes of FINRA Rule 12200; and (iii) whether Defendant's claims arise in connection with Likhtenstein's "business activities." *See id.* For the reasons that follow, the Court finds the parties' dispute meets the requirements set forth in FINRA Rule 12200, and that it must, therefore, grant Defendant's motion to compel arbitration.

**i. Likhtenstein is an "Associated Person" of Osaic.**

Defendant, in her moving brief, claims that "Osaic does not dispute that Likhtenstein is correctly treated as associated with Osaic during the time period at issue for purposes of this court litigation[.]" (Mov. Br. at 1 n.1 (citing Compl. ¶ 14 ("Mr. Likhtenstein was associated with Osaic from 2018 through 2024."))). Defendant reiterates this position in her Reply Brief. (Reply Br. at 2–3 n.2). Osaic, however, argues that its association with Likhtenstein was limited, asserting that "[Likhtenstein] was undisputedly not acting on behalf of Osaic." (Opp. Br. at 21). In making this argument, Osaic highlights that its "associated persons do not take personal loans as part of [its] securities or investment banking business or deal in personal promissory notes" and claims that "Defendant was aware that these transactions with Mr. Likhtenstein were occurring outside of and not related to Osaic." (*Id.*). Osaic further argues that Defendant failed to show that she communicated with Likhtenstein through "Osaic or Royal Alliance Associates, Inc.[‘s] email address," (*id.*), and explains that Likhtenstein had no reason to have an "OSAIC sign" at the time the transactions took place because during that time, he was a financial advisor for Royal Alliance, (*id.* at 21–22).

Under the Rule 12(b)(6) standard, Likhtenstein is an "associated person" of Osaic for the purposes of FINRA Rule 12200, as the Complaint states that "Mr. Likhtenstein was associated with Osaic from 2018 through 2024," (Compl. ¶ 14), and the Court accepts "all well-pleaded allegations as true[,]" *City of Cambridge*, 908 F.3d at 878 (3d Cir. 2018). Therefore, this dispute

appears to meet the second requirement for arbitrability, as it arises between a customer and an associated person of a FINRA member. Moreover, the Court notes that even if the Complaint did not expressly identify Likhtenstein as "associated with Osaic," the record reflects that Likhtenstein would still meet that criterion. (Compl. ¶ 14).

According to FINRA, a "person associated with a member" can be "[a] natural person who is registered or has applied for registration under the Rules of FINRA[.]" FINRA Rule 12100(w). Likhtenstein, at the time of the alleged transactions, was a registered FINRA representative of Osaic (or its predecessor in interest), and thus Likhtenstein qualifies as a "person associated with a member" under FINRA's rules. (*See* Compl. ¶ 14 ("Likhtenstein was formerly a registered representative with Royal Alliance, a registered broker-dealer, which became part of Osaic Wealth, Inc. in June 2023."); *see also* SOC at 55 (ECF Pagination) (Central Registration Depository showing that Marat Likhtenstein was registered with FINRA as a "General Securities Representative" during his time at Osaic Wealth, Inc.)); *GMS*, 2020 WL 924209, at *4 ("Simanski was an associated person of Plaintiff because Simanski was registered under the Rules of FINRA as a representative of Plaintiff.").

Furthermore, FINRA also defines a "person associated with a member" as "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member[.]" FINRA Rule 12100(w). Based on the SOC, Likhtenstein "was a registered representative, employee and agent of [Osaic]" and "was the financial advisor and investment advisor responsible for the handling of the transactions at issue with [Defendant] and was acting within the scope of his position of employment and/or agency with [Osaic]." (SOC ¶ 7). This, therefore, provides another basis for the Court to find that Likhtenstein qualifies as an associated person for the purposes of FINRA Rule 12200.

Osaic makes numerous arguments attacking the extent of its association with Likhtenstein, but they lack merit in the context of this motion. The Court initially notes that Osaic does not contest Likhtenstein's registration with FINRA. *See* FINRA Rule 12100(w); (*see generally* Opp. Br.). Regarding Osaic's arguments related to the alleged "OSAIC" sign in Likhtenstein's basement or that Likhtenstein did not use an "Osaic or Royal Alliance Associates, Inc. email address" during the transactions in question, (Opp Br. at 21–22), such arguments fail because the definition of "person associated with a member" does not require that the associated person externally present their association with a FINRA member to the customer. *See generally* FINRA Rule 12100(w). Furthermore, whether or not Likhtenstein was "acting on behalf of [Osaic]" or whether Defendant subjectively believed that Likhtenstein was acting outside his scope of employment is irrelevant; the relevant inquiry is whether the associated member was "directly or indirectly controlling or controlled by a member" and whether that associated member was "engaged in the investment banking or securities business," FINRA Rule 12100(w). Defendant's SOC reflects that both are the case here. (*See* SOC ¶ 7).

Because the Complaint alleges that Likhtenstein is an "associated person" of Osaic, and the record reflects that Likhtenstein otherwise qualifies as a "person associated with a member" under FINRA Rule 12100(w), the Court finds that Likhtenstein is an "associated person" of Osaic for the purposes of resolving this application.

**ii. Defendant is a "Customer" under Rule 12200.**

Defendant argues that she was Likhtenstein's and Osaic's "customer" and thus meets the first requirement of FINRA Rule 12200. (Mov. Br. at 7–8). Specifically, Defendant contends that "[Defendant] met Likhtenstein many times in his office for investment advice, Likhtenstein sold multiple promissory notes to her, Likhtenstein sent interest payments for these notes to her, and he

sent many texts and emails to [her.]" (*Id.* at 7). Furthermore, Defendant asserts that she was also a customer of Osaic because Likhtenstein offered to her "Osaic-approved investments." (*Id.* at 8).

Osaic, however, argues that Defendant is not its "customer" for Rule 12200 purposes. (Opp. Br. at 11). Citing the Second Circuit's definition of "customer" within the context of that Rule, Osaic argues that a FINRA "customer" is "one who, while not a broker or dealer, either (1) purchases a product or service from a FINRA member . . . or (2) maintains an account with [a] FINRA member." (*Id.* (citing C*itigroup Global Mkts., Inc. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014))). Using this definition, Osaic highlights that Defendant

> never had an investment account, securities brokerage account, or an account of any kind with Osaic. She never entered into any agreements with Osaic. She never made investments through Osaic or entered into any securities transactions through Osaic. Defendant never purchased any goods or services from Osaic and Osaic never acted as a broker-dealer in connection with a purchase or sale of a security for Defendant.

(*Id.* at 12–13). Applying the Second Circuit's definition, Osaic therefore argues that Defendant is not its "customer" under FINRA Rule 12200. (*Id.* at 13).

Osaic further argues that (i) Defendant was not a customer of its allegedly associated person, Likhtenstein, and (ii) even if she was that would not suffice to require Osaic to arbitrate Defendant's claims pursuant to Rule 12200. (*Id.* at 14–16). As to the first point, Osaic argues that Defendant was not a customer of Mr. Likhtenstein because "the [SOC] does not identify any accounts that Defendant had with Mr. Likhtenstein." (*Id.* at 16). Osaic also argues that Defendant's SOC indicates nothing but a personal relationship between the Defendant and Likhtenstein, as the Defendant fails to "describe the nature of these transactions [between Defendant and Likhtenstein]," "does not identify the investments," and according to the Complaint, "the transactions at issue . . . [were] private loans taken by Mr. Likhtenstein." (*Id.*).

As to the second point, Osaic explains that while some courts have required firms to arbitrate with customers of associated persons, other courts found that requiring arbitration in those circumstances "would do 'injustice to the reasonable expectations' of member firms." (*Id.* at 14–15 (citing *Invs. Cap. Corp. v. Brown*, 145 F. Supp. 2d 1302, 1308 (M.D. Fla. 2001)). Osaic contends that requiring it to arbitrate with Defendant would be inconsistent with its reasonable expectations "because the dispute arises out of transactions that occurred without Osaic's knowledge, involvement, and outside of Mr. Likhtenstein's role as a financial advisor for Royal Alliance." (*Id.* at 15).

FINRA has defined the term "customer" in Rule 12100(k). That definition is broad and, on its face, incorporates everyone who is not "a broker or dealer." FINRA Rule 12100(k). As FINRA's definition offers little guidance in practice, courts have endeavored to develop workable standards to guide them in determining who qualifies as a "customer" for Rule 12200 purposes. *See J.P. Morgan Sec., Ins. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d. 70, 77–79 (S.D.N.Y. 2010); *see also SunTrust Banks, Inc. v. Turnberry Cap. Mgmt. LP*, 945 F. Supp. 2d 415, 421 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 32 (2d Cir. 2014) ("[C]ourts have held that the term 'customer' must have a more limited meaning than simply 'all entities other than brokers or dealers.'"). For instance, some courts have utilized the Second Circuit's "bright-line rule[,]" which defines the term "customer" as "one who . . . either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Abbar*, 761 F.3d at 275–76; *see also Velocity Cap. Grp., LLC v. BA Sec., LLC*, No. 22-4527, 2023 WL 2025229, at *3 (E.D. Pa. Feb. 15, 2023) (utilizing the Second Circuit's definition of "customer"); *Tuchman v. UBS Fin. Servs. Inc.*, No. 19-09209, 2020 WL 13561713, at *10 (S.D.N.Y. Nov. 9, 2020) ("Here, Mrs. Frank did not purchase any goods or services from either UBS or an 'associated person' of UBS; thus, there

is no evidence indicating a customer relationship.”). Other courts have utilized the Fourth Circuit’s interpretation of the term, defining “customer” as “one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business.” *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324–25 (4th Cir. 2013). At least one court within the Third Circuit has meshed together various Courts of Appeals’ interpretations of the term, holding that a customer is “one who either: (1) purchases commodities or services from a FINRA member in the course of the member’s investment banking and securities business; or (2) has an account with a FINRA member.” *GMS*, 2020 WL 924209, at *4 (collecting cases). While these definitions vary somewhat, the constant is that each court has “rejected the interpretation that a customer is anyone who is not a broker or dealer; instead each court tied the definition of ‘customer’ to the FINRA member’s business activities in the securities and investing field.” *Id.*

Having considered the various definitions, and noting their similarity, the Court finds the Fourth Circuit’s interpretation of the term “customer” to be persuasive in the context of FINRA Rule 12200. In making this finding, the Court notes that the Fourth Circuit’s definition of “customer,” requiring the person to engage in the purchase of a service or commodity arising from FINRA-regulated activity, comports with FINRA’s mission to “promote through cooperative effort the investment banking and securities business . . . and to encourage and promote among members observance of federal and state securities laws[.]” *Carilion*, 706 F.3d at 326 (citing Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010)). The relevant part of the Second Circuit’s definition, requiring that a customer “purchase[] a good or service from a FINRA member[,]” to achieve “customer” status, does not provide

objective guardrails as to what qualifies as an acceptable "good or service," thus potentially including activities that go beyond FINRA's mission to "promote . . . the investment banking and securities business." *Abbar*, 761 F.3d at 275; *see also id.* This Court will therefore utilize the Fourth Circuit's definition to determine whether Defendant is a "customer" pursuant to FINRA Rule 12200.[3]

For the Court to find that Defendant was a "customer" under the Fourth Circuit's definition, the Complaint and its attached exhibits must show that (i) Defendant purchased a commodity or service from a FINRA member; and (ii) that purchase arose from a FINRA-regulated business activity. *Carilion*, 706 F.3d at 325. Critically, several courts have recognized that people who make purchases from "associated persons" of FINRA members also qualify as "customers" of those members for the purposes of FINRA Rule 12200. *See Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 396 (E.D.N.Y. 2014) ("[T]he Second Circuit made clear that the customer of a FINRA member's associated person is entitled to arbitrate against the member itself as long as the claim arises out of the associated person's business activities." (citing *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 51 (2d Cir. 2001)); *see also Abbar*, 761 F.3d at 274 ("[T]he rule requires a FINRA member to arbitrate disputes with its customers, or the customers of its associated persons[.]" (internal quotations and citations omitted)); *GMS*, 2020 WL 924209, at *4 ("Here, Defendant is a customer of Plaintiff because Defendant purchased investment services from Simanski, an associated person of Plaintiff."). The Court finds that approach persuasive and will

[3] The Court notes, however, that even if this Court applied the Second Circuit's less-restrictive definition, Defendant would still qualify as a "customer" pursuant to FINRA Rule 12200. According to the allegations in the Complaint, Defendant purchased "promissory notes" from Likhtenstein, (*Compl.* ¶ 27), who was an associated person of a FINRA-regulated member at the time of the transactions, (*see Compl.* ¶ 14 ("Marat Likhtenstein was formerly a registered representative with Royal Alliance, a registered broker-dealer, which became part of Osaic Wealth, Inc. in June 2023."); *see also id.* ¶ 16 ("In August 2024, FINRA barred Mr. Likhtenstein from the securities industry for his refusal to cooperate with a FINRA investigation related to Osaic's disclosure regarding the lack of disclosure of the loan transaction.")).

apply it when determining whether Defendant is a "customer" eligible to request arbitration pursuant to Rule 12200.

According to the Complaint, Likhtenstein "issued [Defendant] a promissory note," (Compl. ¶ 27), and Defendant "provided $296,500 to Mr. Likhtenstein and he then misappropriated the funds," (*id.* ¶ 13). Furthermore, in the SOC, Defendant alleges that "[Osaic], acting through Likhtenstein, obtained $296,500 from [her] for investment purposes[.]" (SOC ¶ 5). Finally, both the Complaint and the SOC indicate that Likhtenstein was a representative of a FINRA-regulated member. (*See* Compl. ¶ 14 ("Marat Likhtenstein was formerly a registered representative with Royal Alliance, a registered broker-dealer, which became part of Osaic Wealth, Inc. in June 2023."); *see also* SOC ¶ 7 ("At all times relevant to the transactions alleged herein, Likhtenstein was a registered representative, employee and agent of [Osaic], a FINRA member with its main office in Scottsdale, Arizona.")). Therefore, based on the allegations in the Complaint and the SOC, this Court finds that the Defendant purchased a commodity or service from an associated person of a FINRA member.

That is not the end of the analysis, however. Defendant will only qualify as a "customer" if her purchase arose out of FINRA-regulated business activities. *Carilion*, 706 F.3d at 325. As the Fourth Circuit expressed in *Carilion*, FINRA-regulated business activities encompass "the activities of investment banking and the securities business."[4] *Id.* Defendant argues that because

[4] The Fourth Circuit's definition of customer, specifically that the purchase in question must arise from FINRA-regulated business activity and thus "the activities of the investment banking and the securities business," aligns with other courts' analyses of the third element of FINRA 12200. *Compare Land v. Rokah*, 682 F. Supp. 3d 385, 395 (S.D.N.Y. 2023) ("[T]o arbitrate a claim before the FINRA arbitration panel, the claim must arise out of the 'business activities' of the associated person related to the FINRA member, ***namely their investment banking and securities business activities***." (emphasis added)), *with Carilion*, 706 F.3d at 327 ("In short, we conclude that 'customer,' as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA—***namely investment banking and securities business activities***." (emphasis added)). Therefore, there will be some overlap between the Court's analyses of the first and third elements of FINRA Rule 12200.

the promissory notes she acquired from Likhtenstein qualify as securities under the Securities Exchange Act (the "SEA"), Likhtenstein's "solicit[ation regarding] the purchase of [those] promissory notes [as investments]" constitutes a "business activity" for the purposes of the "customer" analysis. (Mov. Br. at 11–12); *see also* 15 U.S.C. § 78c(a)(10). Furthermore, Defendant cites to *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990), for the proposition that, despite the Court lacking the power to interfere with the arbitrator's decision on whether the promissory notes in question were securities, there is a "presumption that every note is a security." (Mov. Br. at 12). Finally, using the test set forth in *Reves*, Defendant analogizes this dispute to a situation that would likely qualify as a security, specifically the situation in which "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate[.]" (Mov. Br. at 12 (quoting 494 U.S. at 66)).

Osaic, however, argues that "the promissory notes do not reflect investments. They reflect personal loans collateralized by Mr. Likhtenstein's personal assets." (Opp. Br. at 19). Osaic further argues that despite Defendant's assertions that the promissory note qualifies as a security under *Reves*, the case "actually supports the opposite finding" that the promissory note is not a security. (*Id.*). Specifically, Osaic contends that "the notes proffered by Defendant are personal obligations of Likhtenstein, secured by Mr. Likhtenstein's home and life insurance policy," and these notes "bear[] a 'family resemblance' to the types of notes that are not deemed securities, such as those secured by a mortgage on a home." (*Id.* at 20–21). In her Reply, Defendant contends that "[t]he investment notes . . . were not a mortgage and instead were collateralized by Likhtenstein's home. Likhtenstein was not using [Defendant's] funds to buy or build a house, for which a mortgage would be . . . used." (Reply Br. at 5 n.3). Furthermore, Defendant reiterates

that "[i]f this Court were to rule on [whether the promissory note is a security], it would be interfering with a merits decision that only the arbitrators can decide." (*Id.* at 4 (citing *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 649–50 (1986))).

Under the SEA, the definition of "security" includes "any note[,]" 15 U.S.C. § 78c(a)(10), and *Reves* outlined the framework for determining whether a note qualifies as a "security" pursuant to the that statutory scheme., 494 U.S. at 67. Specifically, the Court explained that under its modified "family resemblance" test, "[a] note is presumed to be a 'security,'" and this presumption "may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors [the Court has] identified) to one of the enumerated categories of instrument."[5] *Reves*, 494 U.S. at 67. The four factors to consider include "(1) the motivations of the buyer and seller for entering into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor reduces the risk of the instrument." *Fox v. Dream Tr.*, 743 F. Supp. 2d 389, 399 (D.N.J. 2010) (citing *Reves*, 494 U.S. at 56). These factors are not elements, but rather "points of comparison for the ultimate determination of 'family resemblance.'" *Id.* (citing *Robyn Meredith, Inc. v. Levy*, 440 F. Supp. 2d 378, 384 (D.N.J. 2006)).

Although Defendant is correct that this Court cannot "resolve a merits issue that is committed to the arbitrators for decision," (Reply Br. at 4), the Court must still, however, determine whether "the dispute at issue falls within the scope of [the arbitration] agreement[,]" *Century Indem. Co.*, 584 F.3d at 523; *see also AT&T*, 475 U.S. at 650 ("[A]n order to arbitrate the

[5] *See Exch, Nat. Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976) (Financial instruments that are typically considered as non-securities include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).").

particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). As noted above, the Court has determined that Likhtenstein is an "associated person" of Osaic. To determine whether this dispute falls within the scope of FINRA Rule 12200, the Court must also consider whether Likhtenstein's sale of the promissory note to Defendant arose out of "FINRA-regulated business activities" such that this Court can determine whether Defendant was Likhtenstein's "customer." *See Carilion*, 706 F.3d at 325. Therefore, the Court must determine whether promissory notes are regulated by FINRA, and thus whether the notes in question appear to be "securities" pursuant to *Reves*, in order to determine whether the parties' dispute is subject to arbitration. *See Reves*, 494 U.S. at 65–67.

The first *Reves* factor requires the Court to consider "the motivations that would prompt a reasonable seller and buyer to enter into the transaction." *Fox*, 743 F. Supp. 2d at 399 (internal quotation marks omitted) (quoting *Reves*, 494 U.S. at 66). In *Reves*, the Supreme Court noted two scenarios in which a note might or might not be considered a "security" under the SEA:

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

*Reves*, 494 U.S. at 66; *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 858 (1975) ("What distinguishes a security transaction . . . is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use."). Applying *Reves*' guidance, the Court finds that the "motivations" factor falls in favor of characterizing the promissory notes in

question as a "security." 494 U.S. at 66. According to the Complaint, Defendant's claims against Osaic "all stem from her alleged provision of funds to an individual, Marat Likhtenstein, for purported investments," (Compl. ¶ 13 (citing SOC ¶¶ 4 & 15)), and these investments were "promissory notes," (Compl. ¶ 27). Furthermore, according to the Securities and Exchange Commission's (the "SEC") civil enforcement action referenced in the Complaint,[6] Likhtenstein "falsely told [c]lients . . . that if they purchased Promissory Notes from him . . . they would earn extraordinary interest rates through investments in highly lucrative business opportunities and deals." (D.E. No. 10-2 ("SEC Action") ¶ 5). Finally, the same enforcement action indicates that "[t]he Promissory Note instruments typically stated that the raised funds would be used to fund Likhtenstein's 'business needs[.]'" (*Id.* ¶ 53). This scenario closely tracks the sort of relationship that the *Reves* Court acknowledged as "likely" to be a security. 494 U.S. at 66. Specifically, Defendant provided funds to Likhtenstein in exchange for investments, (Compl. ¶ 13), with the goal of obtaining "extraordinary interest rates" from the investments, (SEC Action ¶ 5), and Likhtenstein used the monies provided by Defendant for his general "business needs," (*id.* ¶ 53). Therefore, the Defendant, in providing funds to obtain promissory notes, "part[ed] with [her] money in the hope of receiving profits from the efforts of others," and nothing in the Complaint

---

[6] Under the Rule 12(b)(6) standard as expressed in *Guidotti*, the Court may consider "documents relied upon in the complaint" to rule on a motion to compel arbitration. 716 F.3d at 776. Therefore, the Court can use the SEC enforcement action and the Kings County indictment of Marat Likhtenstein, both of which are matters of public record, to determine whether Defendant is a "customer" for the purposes of FINRA Rule 12200 because these documents are specifically relied upon in the Complaint and attached to Defendant's motion to compel arbitration. (*See* Compl. ¶ 16 ("On March 12, 2025, the Kings County District Attorney indicted Mr. Likhtenstein on 22 felony counts relating to a $1.24 million Ponzi-like scheme."); Compl. ¶ 17 ("The [SEC] separately filed a civil enforcement action alleging that Mr. Likhtenstein sold more than $4.1 million in fraudulent promissory notes.")); *see also In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document ***integral to or explicitly relied*** upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." (cleaned up and emphasis in original)); *Scarcelle*, 2024 WL 150330, at *3 ("Here, the Court concludes that the Rule 12(b)(6) standard governs because the parties rely solely on the allegations in the Complaint and the terms of the relevant contracts, ***which are incorporated into the Complaint and attached to Castle Window's motion papers***." (emphasis added)).

or the attached SOC suggests that Defendant was purchasing the promissory note "for personal consumption" or "personal use." *Forman*, 421 U.S. at 858; (*see generally* Compl.; SOC).

The second *Reves* factor requires the Court to consider whether the promissory note "is an instrument in which there is common trading for speculation or investment." *Reves*, 494 U.S. at 66 (internal quotation marks and citation omitted). Although the Supreme Court has held that notes being "sold to a broad segment of the public" satisfies this factor, *id.* at 68, other courts have commonly considered "the level of sophistication of potential buyers" to be a factor in this determination as well. *Fox*, 743 F. Supp. 2d at 400; *see also McNabb v. S.E.C.*, 298 F.3d 1126, 1132 (9th Cir. 2002) ("To be sure, six customers in total does not constitute 'a broad segment of the public,' but this fact alone is not dispositive. Instead it must be weighed against the purchasing individual's need for the protection of the securities laws." (citations omitted)). The court finds this factor to be neutral. The SEC enforcement action indicates that Likhtenstein "solicited, recommended, and sold self-issued investments in the form of promissory notes . . . to at least 15 clients[,]" (SEC Action ¶ 2), and that relatively modest number not constitute a "broad segment of the public." *Reves*, 494 U.S. at 66. However, "[Defendant] is exactly the kind of individual investor that securities law seeks to protect[.]" *Fox*, 743 F. Supp. at 400. According to the SOC, "[Defendant] is fifty-nine (59) years old . . . . She was born in Moscow, Russia and emigrated to the United States in 1991 as a refugee." (SOC ¶ 2). Additionally, according to the SEC enforcement action against Likhtenstein, he "falsely told Clients, many of whom were elderly, that if they purchased Promissory Notes from him through his 'side business,' they would earn extraordinary interest rates through investments in highly lucrative business opportunities and deals." (SEC Action ¶ 5). Finally, the SEC Action alleges that "Likhtenstein's Clients also were typically financially unsophisticated, as most of them had little to no prior securities investment

experience." (*Id.* ¶ 33). Thus, Likhtenstein "solicited individuals, not sophisticated institutions." *Stoiber v. S.E.C.*, 161 F.3d 745, 751 (D.C. Cir. 1998); *see also Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 813 (2d Cir. 1994) ("[T]he record before us does not suggest that the participations here were restricted to sophisticated investors who had the capacity to acquire information about the debtor." (internal quotation marks and citation omitted)).

The third *Reves* factor requires the Court to examine "the reasonable expectations of the investing public." *Reves*, 494 U.S. at 66. "Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments." *Stoiber*, 161 F.3d at 751 (citing *Reves*, 494 U.S. at 68–69). Other circuits have held that "[w]hen a note seller calls a note an investment, in the absence of contrary indications 'it would be reasonable for a prospective purchaser to take the [offeror] at its word.'" *Id. (second alteration in original)* (quoting *Reves*, 494 U.S. at 69). "Conversely, when note purchasers are expressly put on notice that a note is not an investment, it is usually reasonable to conclude that the 'investing public' would not expect the notes to be securities." *Id.* (citing *Banco Espanol de Credito v. Sec. Pac. Nat. Bank*, 973 F.2d 51, 55–56 (2d Cir. 1992)). This factor falls in favor of qualifying the promissory notes as a "security." According to the SOC, Likhtenstein "obtained $296,500 from [Defendant] for ***investment*** purposes[.]" (SOC ¶ 5) (emphasis added). Furthermore, in its enforcement action the SEC alleges that "Likhtenstein typically told potential Promissory Note purchasers that he . . . would use their money to make ***investments*** in highly lucrative business opportunities and deals and would pay guaranteed high rates of return." (SEC Action ¶ 42) (emphasis added). Finally, the SEC further alleges that "[t]he Promissory Note instruments typically stated that the raised funds would be used to fund Likhtenstein's 'business needs,' which, coupled with Likhtenstein's statements, caused his Clients to understand that Likhtenstein would

be using their money to make an investment in a business opportunity[.]" (*Id.* ¶ 53). Taken as a whole, the Court finds that a purchaser would reasonably view Likhtenstein's promissory notes as investments, as Likhtenstein communicated to his investors that the promissory notes were investments that would result in high rates of return. (*Id.* ¶ 42).

The fourth and final factor of the *Reves* analysis is "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." 494 U.S. at 67. This factor asks the Court to examine whether there exist "alternative regulatory scheme[s], collateral, [or] insurance" that "reduc[es] the risk to note holders sufficiently to render[] the protection of federal securities laws unnecessary." *Stoiber*, 161 F.3d at 751 (citations omitted). This factor falls in favor of qualifying the promissory note as a security. In terms of regulatory schemes, there is no indication in the parties' motion papers, the Complaint, the SOC, or the SEC action against Likhtenstein that the promissory notes in question might be subject to other regulatory schemes that would "render[] the protection of federal securities laws unnecessary," such as the Federal Deposit Insurance Corporation ("FDIC") or the Comptroller of Currency. *Id.* (citing *Reves*, 494 U.S. at 69); *see Marine Bank v. Weaver*, 455 U.S. 551, 558–59 (1982) (holding that a certificate of deposit from a federally regulated bank is not a security under the SEA because such an instrument is "insured by the [FDIC]" and thus "abundantly protected under the federal banking laws."); *Banco Espanol de Credito*, 973 F.2d at 55 (finding the application of securities laws unnecessary when "the Office of the Comptroller of the Currency has issued specific policy guidelines addressing the sale of loan participations"). Considering collateralization and insurance, the Complaint states that Likhtenstein "used his private residence to secure the loans made by Defendant," (Compl. ¶ 27), and according to the SEC enforcement action against Likhtenstein, he "further typically

represented to Clients who invested in the Promissory Notes that their investments were collateralized by his $1.4 million house in Brooklyn, New York[.]" (SEC Action ¶ 49). But, "his house was heavily mortgaged, co-owned with his wife, and had been listed as collateral on numerous Promissory Notes, meaning that the home was ***essentially worthless as collateral***." (*Id.* ¶ 50 (emphasis added)). Therefore, the existence of that "collateral" did not reduce the risk of investing in the promissory notes. (*Id.*).

In summary, the first, third and fourth factors lean toward qualifying the note as a security, while the second factor is neutral. This Court therefore concludes that the promissory notes in question "do not bear a strong enough resemblance to the categories of notes declared by the Supreme Court to be outside the definition of securities[.]" *Stoiber*, 161 F.3d at 752; *see also Fox*, 743 F. Supp. 2d at 401 ("The transaction is an investment by an individual for the purpose of financing another entity's substantial investment."). Based on its careful review of the parties' submissions, this Court finds that the promissory note at issue appears to be a security, and that Likhtenstein's sale of the note to Defendant therefore arose out of FINRA-regulated business activity.

Because Defendant purchased a commodity from an associated person of a FINRA member, and the purchase of the commodity arose out of FINRA-regulated business activities,[7] Defendant qualifies as a customer for the purposes of FINRA Rule 12200. *Carilion*, 706 F.3d at 325.

**iii. This Dispute Arose in Connection with Likhtenstein's Business Activities.**

When evaluating the final requirement for FINRA arbitrability under Rule 12200, the Court

[7] The Court also observes that promissory notes are the subject of specific FINRA proceedings, and thus "FINRA-regulated." *See* FINRA Rule 13807 ("This rule applies to arbitrations solely involving a member's claim that an associated person failed to pay money owed on a promissory note.").

must consider whether "the dispute arises in connection with the business activities of the member or the associated person." *GMS*, 2020 WL 924209, at *4 (citing FINRA Rule 12200). On this point, Defendant contends that Osaic "solicited the purchase of these promissory notes for investment purposes." (Mov. Br. at 11; *see also* SOC ¶ 5 ("[Osaic], acting through Likhtenstein, obtained $296,500 from [Defendant] for investment purposes[.]")). Additionally, while Defendant notes that the Court "cannot interfere with the merits of the arbitrators' decision regarding whether the promissory notes sold to [Defendant] were securities," Defendant highlights that, as per *Reves*, there is a "presumption that every note is a security." (Mov. Br. at 12 (quoting *Reves*, 494 U.S. at 65)). Given this presumption, Defendant argues that "[s]ales of securities" relate to an "associated person's business activities for purposes of FINRA Rule 12200." (Mov. Br. at 12 (internal quotations omitted)). Defendant further argues that the allegation in her SOC that "[Osaic] failed to supervise Likhtenstein" arises in connection with Osaic's own business activities. (*Id.* (first citing *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir. 2002); and then citing *USAllianz Sec., Inc. v. S. Mich. Bancorp, Inc.*, 290 F. Supp. 2d 827, 831 (W.D. Mich. 2003))). In support, Defendant notes that Osaic (or its predecessor-in-interest) "has frequently been sanctioned by the SEC and FINRA for supervisory misconduct similar to the misconduct that [she] alleges in this case." (Mov. Br. at 13; *see also* SOC ¶ 29 ("[Osaic] negligently failed to review Likhtenstein's bank accounts, even though its predecessor firm, Royal Alliance Associates, Inc., was sanctioned by the SEC for failing to review the bank account of an off-site representative who misappropriated funds from customers.")).

In response, Osaic argues that the parties' dispute does not arise in connection with either its business activities or those of Likhtenstein. (*See* Opp. Br. at 25–29). It first contends that Defendant cannot meet the burden for this element because Defendant failed to offer evidence that

"Defendant had any account with [Osaic] or with Mr. Likhtenstein." (*Id.* at 25–26 (citing *Needle v. T. Rowe Price Grp.*, No. 21-4786, 2022 WL 900398, at *4 (E.D. Pa. Mar. 28, 2022) ("Courts have interpreted this third requirement of Rule 12200 as only requiring arbitration of disputes 'arising from the account' of the customer."))). Osaic further argues that this dispute has no "connection with the investment banking or securities business activities of a[n] . . . associated person" because "no evidence exists that funds were given by Defendant to Mr. Likhtenstein as part of the securities business or that he received compensation for securities products or investment advice or services." (*Id.* at 26).

Courts in this District and beyond have recognized that a dispute "arises in connection with the business activities of the member or the associated person" when the dispute involves "a negligent failure to supervise claim." FINRA Rule 12200; *O.N. Equity Sales Co. v. Hoegler*, Nos. 07-2703 & 07-3211, 2008 WL 304924, *4 (D.N.J. Jan. 28, 2008);[8] *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58–59 (2d Cir. 2001) ("A dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business." (quoting *First Montauk Sec. Corp. v. Four Mile Ranch Dev.*, 65 F. Supp. 2d 1371, 1379 (S.D. Fla. 1999))). In the SOC, Defendant alleges that "[Osaic] had supervisory duties over Likhtenstein, and failed to diligently and properly supervise its officers, employees, and agents." (SOC ¶ 113). Defendant further alleges that "[Osaic] breached its duty to [her] by failing to provide sufficient control and supervision over its officers, employees, agents, and registered representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-

[8] FINRA is the successor to the National Association of Securities Dealers, Inc. ("NASD"), and their respective standards for requiring arbitration of disputes are very similar. *Compare* FINRA Rule 12200 ("The dispute arises in connection with the business activities of the member or the associated person,") *with* NASD Rule 10301 ("Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series . . . arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code."). Therefore, the Court finds it proper to apply prior analyses of the NASD analogue when considering an application to compel arbitration pursuant to FINRA Rule 12200.

regulatory organization policies, and procedures." (*Id.* ¶ 116). Finally, Defendant alleges, based on the aforementioned allegations, that "[Osaic's] actions . . . constitute both negligence and gross negligence." (*Id.* ¶ 117). As the parties' dispute involves "a negligent failure to supervise claim," the Court finds that it therefore arises in connection with Likhtenstein's business activities for the purposes of FINRA Rule 12200.

Furthermore, other courts have held that the "business activities" element of FINRA Rule 12200 is met when the dispute "arise[s] out of the business activities of the associated person related to the FINRA member, namely their investment banking and securities business activities." *Land v. Rokah*, 682 F. Supp. 3d 385, 395 (S.D.N.Y. 2023) (internal quotation marks omitted). Because this dispute revolves around Defendant's provision of funds to Likhtenstein—who was an "associated person" of or its predecessor-in-interest at the time—in exchange for a promissory note, (*see* Compl. ¶¶ 13 & 27), and because that note constitutes a security (as described in Section III(B)(ii), above), and otherwise falls "within FINRA's regulatory ambit," *INTL FCStone Fin., Inc. v. Jacobson*, No. 19-1438, 2019 WL 2356989, at *7 (N.D. Ill. June 4, 2019); *see also* FINRA Rule 13807), Defendant's claims satisfy the "business activities" prong of FINRA Rule 12200.

Osaic makes numerous arguments regarding the third element of FINRA 12200, but the Court finds that they are without merit. For instance, Osaic cites to both *Lincoln Fin. Sec. Corp. v. Foster*, No. 20-1132, 2021 WL 1197534, at *5 (D. Conn. Mar. 29, 2021) and *INTL FCStone Fin.*, 2019 WL 2356989, at *8, for the proposition that this dispute does not involve Likhtenstein's business activities because "no evidence exists that funds were given by Defendant to Mr. Likhtenstein as a part of the securities business." (Opp. Br. at 26). The Court finds that both cases are distinguishable.

*Lincoln* addressed whether an "associated person" who referred his clients to an insurance

agent that subsequently provided fraudulent investment advice was subject to arbitration pursuant to FINRA Rule 12200. *Lincoln*, 2021 WL 1197534, at *2–4. The district court held that the dispute likely would not be arbitrable under FINRA Rule 12200, as the defendants failed to offer evidence that they either "purchased an investment instrument from . . . [the associated person] or that [the associated person] received any compensation for, or related to, their purchase of an investment instrument." *Id.* at *6. Here, however, Defendant purchased an investment instrument in the form of a promissory note ***directly*** from Osaic's associated person, Likhtenstein, in exchange for compensation in the amount of $296,500. (Compl. ¶¶ 13–27).

*INTL FCStone Fin., Inc.* concerned commodities and futures, investment instruments that are not FINRA-regulated, and the district court held that holders of those non-FINRA-regulated instruments were not "customers" pursuant to FINRA Rule 12200. *INTL*, 2019 WL 2356989, at *8. The promissory notes at issue in this case are FINRA-regulated, *see* FINRA Rule 13807, and as discussed above, appear to constitute a security after application of the *Reves* factors.

Finally, Osaic cites to *Needle v. T. Price Grp.* for the proposition that this dispute fails to arise in connection to either Osaic's or Likhtenstein's business activities because Defendant did not "ha[ve] any account with [Osaic] or with Mr. Likhtenstein." 2022 WL 900398, at *4; (Opp Br. at 25–26). In *Needle*, the court cited *Abbar* as support for the claim that having an account with a FINRA member or its associated person satisfies the third prong of FINRA Rule 12200. 2022 WL 900398, at *3 (citing *Abbar*, 761 F.3d at 275). *Abbar*, however, does not explicitly grapple with the third requirement of FINRA Rule 12200, but rather what qualifies as a "customer" for the first prong of the analysis. *See Abbar*, 761 F.3d at 275 ("We are thus presented with an issue that, until now, this Court has been able to avoid: the precise boundaries of the FINRA meaning of customer." (citations and internal quotations omitted)). Therefore, *Abbar's*

applicability to the third prong of the FINRA Rule 12200 analysis is not immediately clear. *Id.* Furthermore, even assuming, *arguendo*, that *Abbar* held that the third requirement of FINRA Rule 12200 can be satisfied if the customer has an account with either the FINRA member or its associated person, such a holding would merely be persuasive authority and not binding on this Court. Moreover, since this Court has adopted the Fourth Circuit's definition of the term "customer"—which does not limit customer status to those who have "an account with a FINRA member," this Court finds it unnecessary and inappropriate to extend *Abbar's* "customer" analysis to the third prong of FINRA Rule 12200. *See Abbar*, 761 F.3d at 275; *Carilion*, 706 F.3d at 325.

Based on the foregoing, the Court finds that the information in the Complaint and the SOC establishes that Defendant's claims against Osaic arise out of Likhtenstein's business activities. Defendant has, therefore, satisfied the third prong for arbitration under FINRA Rule 12200.

## IV. CONCLUSION

As the Court is satisfied that the parties' dispute satisfies all three prongs for arbitrability under FINRA Rule 12200, the Court will **GRANT** Defendant's motion to compel arbitration.[9] Osaic's related Motion for a Preliminary Injunction prohibiting arbitration is **DENIED**. An appropriate Order accompanies this opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**
Date: September 30, 2026

[9] Given this determination, the Court need not address whether a presumption of arbitrability applies in this case.